In the Supreme Court of Georgia

Decided:   October 5, 2015

S15A1192.  BUTTS v. THE STATE.

NAHMIAS, Justice.

Appellant Jarvis Butts was found guilty of felony murder and other crimes in connection with the shooting deaths of two men, Mark Jones and Christopher Jackson, and the armed robbery of a third man, Joshua McCarter. Appellant contends that the evidence presented at his trial was legally insufficient to support his convictions and that the trial court applied the wrong standard in denying his motion for new trial on the general grounds.  We affirm.[1]

---

[1] The crimes occurred on December 9, 2009.  On March 4, 2010, a Cobb County grand jury indicted Appellant along with Darchelle Arnold, Desmond Post, Rolaunda Fripp, and Joseph Brown on two counts of malice murder, two counts of felony murder during the commission of armed robbery, two counts of felony murder during the commission of aggravated assault, three counts of armed robbery, three counts of aggravated assault with a deadly weapon, and three counts of aggravated assault with intent to rob.  In May 2011, Arnold pled guilty and agreed to testify against her co-indictees.  At a two-week trial from March 19 to 30, 2012, the jury acquitted Appellant, Post, Fripp, and Brown of malice murder but found them guilty of the remaining charges.  On May 3, 2012, the trial court sentenced Appellant to serve concurrent terms of life in prison for the felony murders of Jones and Jackson during the commission of armed robbery and a consecutive term of 20 years for the armed robbery of McCarter; the court merged the remaining guilty verdicts for sentencing.  On May 4, 2012, Appellant filed a motion for new trial, which he amended with new counsel on July 24, 2013.  On September 3, 2013, the trial court held a hearing on the motion, which the court denied two days later.  Appellant filed a timely notice of appeal, and his case was docketed in this Court for the April 2015 Term and submitted for decision on the briefs.  Post, Fripp, and Brown have also appealed, and their cases were all orally argued on September 14, 2015.  See Post

1.     Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. Appellant, Darchelle Arnold, Desmond Post, Rolaunda Fripp, and Joseph Brown all lived at the Las Colinas apartment complex in Marietta. Appellant and Arnold, who have a child together, lived in an apartment with two roommates. Post lived alone in a studio apartment. And Fripp and Brown, who have a child together, lived in another apartment.

In the early morning hours of Tuesday, December 8, 2009, Arnold lent her car, which had a suspended tag because the insurance had lapsed, to Fripp and Brown. At 1:48 a.m., a Marietta Police officer pulled over Fripp and Brown near Las Colinas based on the suspended tag. Brown called Arnold, who walked to the scene with Appellant to retrieve her belongings from the car before it was towed away. The officer issued citations to Fripp and Arnold, seized the tag, and impounded the car. Fripp and Brown then went with Appellant and Arnold to their apartment, where the four of them devised a plan to obtain the money they needed to get Arnold's car back and to keep Fripp and Brown from being evicted for not paying their rent. Fripp and Arnold were

v. State, Case No. S15A1189; Fripp v. State, Case No. S15A1190; Brown v. State, Case No. S15A1193.

2

going to the Sportsline Bar and Grille in Marietta that night for $2 Tuesdays, and it was decided that they would lure some men back to an abandoned apartment at Las Colinas, where Appellant and Brown would be waiting to rob the men.

That night at Sportsline, the victims, McCarter, Jones, and Jackson, were "flashing their money," which drew Arnold and Fripp's attention. Arnold flirted with McCarter, who eventually came to her table and introduced himself and his friends. For the rest of the evening, McCarter bought drinks for Arnold and Fripp and danced with Arnold. When the bar was closing, Jones offered to give the two women a ride home. He drove an SUV with Fripp in the front passenger seat and Arnold and McCarter in the back seat, while Jackson followed them in another car. On the way to Las Colinas, the group stopped so McCarter could use an ATM. When they left the ATM, Jones neglected to turn on his headlights, and at 1:50 a.m. on December 9, 2009, a Cobb County Police officer initiated a traffic stop. Jones and Fripp switched places as the officer approached, because Jones's driver's license was suspended. Fripp told the officer that they were coming from Sportsline and headed to a nearby apartment

3

complex. Fripp did not appear to be intoxicated, so the officer let them go with a warning.

As the group drove towards Las Colinas again, Arnold called Appellant and told him that she and Fripp were bringing three men. Fripp directed the group to the abandoned apartment, telling everyone to be quiet because her mother was inside with a baby. Jones, Jackson, and McCarter walked into the dark apartment followed by Arnold and then Fripp, who closed the door behind her and locked it. Appellant and Brown had enlisted Post to help with the robbery, and as soon as Fripp closed the door, they emerged from hiding in the kitchen wearing dark hooded sweatshirts and bandanas over their faces. Fripp pushed Arnold to the back of the apartment, where the two women climbed out an open window and ran to Appellant and Arnold's apartment to wait. Brown pulled out a handgun, and Appellant pretended to have a gun, holding his cellphone inside the pocket of his sweatshirt with his arm extended towards the victims. Brown yelled, "get your hands up!" Jones, Jackson, and McCarter, who were unarmed, complied, and Appellant and Post began rifling through the victims' pockets. There was a tussle, and Brown opened fire, hitting Jones once in the head and Jackson once in the back. Brown then put the gun to McCarter's

4

head and demanded his property, and he handed over his wallet with his driver's license inside and other items. Appellant, Brown, and Post fled to Appellant and Arnold's apartment, where Arnold and Fripp were waiting. Brown told the women that "he had shot them" and started to panic, and Post took away Brown's gun.

Meanwhile, McCarter ran out of the abandoned apartment to a nearby convenience store, where he called 911. Based on his description of the apartment, the Marietta police were able to locate it. Jones was pronounced dead at the scene, and Jackson died shortly after arriving at the hospital. McCarter was interviewed, and Detective Jonnie Moeller was assigned to the case as the lead investigator. Based on McCarter's statements, information from the two traffic stops, Detective Moeller's previous interactions with Arnold and Post, and other evidence, the detective suspected that Appellant, Arnold, Post, Fripp, and Brown may have been involved in the robbery and shootings.

Detective Moeller went with other officers to Fripp and Brown's apartment, where she spoke with them for about ten minutes. She then went to Appellant and Arnold's apartment, but there was no answer, so she went to Post's apartment, where Appellant answered the door in boxer shorts and a tank

5

top. Detective Moeller asked to speak with Post and then Arnold, and they came to the door wearing sleeping clothes as well. The detective then spoke privately with Arnold, who said she had gone to Sportsline that evening and left with some men and that they were stopped by a Cobb County police officer on the way home. Arnold was nervous and shaking and started to tear up when Detective Moeller asked her what happened after that. At that point, the detective had Appellant, Arnold, and Post taken into custody and secured Post's apartment while a search warrant was obtained. A few hours later, Brown and Fripp were also taken into custody.

Appellant, Post, and Brown all gave statements to the police admitting that they waited in the abandoned apartment for Fripp, Arnold, and the three victims, whom they then attacked and robbed as planned, splitting the cash and other items that they stole. During the search of Post's apartment, the police recovered three dark hooded sweatshirts, the dress that Arnold was wearing that night at Sportsline, and a pair of jeans with Appellant's Georgia identification card, McCarter's driver's license, and a $100 bill in the pockets. Under Post's bed, police found a safe containing $400 in cash and a wallet with Jackson's driver's license and Jones's identification card inside.

6

The next day, Bianca Townsend, who lived across the hallway from Appellant and Arnold and was good friends with Arnold, found a fabric lunch box in her apartment on the couch underneath a cover. The apartment had been unlocked, and Townsend recognized the lunch box from seeing it in Appellant and Arnold's apartment. When Townsend opened the lunch box and found a gun inside, she called the police. Ballistics testing showed that the bullet taken from Jones's skull and two shell casings recovered from the crime scene were fired from the gun found in the lunch box. Arnold later pled guilty and testified for the State at the trial of Appellant, Post, Fripp, and Brown.[2]

2. Appellant contends that the evidence presented at trial was legally insufficient to support his convictions for the armed robbery of McCarter and the two felony murder counts, which were predicated on the armed robbery of Jones and Jackson. Appellant asserts that the evidence showed that Brown was the only person who knew that a gun was going to be used in the robbery and there was no evidence that Appellant was a party to an *armed* robbery of the victims; that there was no evidence that he personally took any property from

---

[2] The trial court's denial of Arnold's motion to withdraw her guilty pleas was affirmed by this Court in Arnold v. State, 292 Ga. 95 (734 SE2d 382) (2012).

7

the victims; and that there was no evidence that he proximately caused the death of Jones or Jackson.

"All participants in a plan to commit robbery are responsible for the criminal acts that are a probable consequence of the plan and are committed while executing it." Smith v. State, 268 Ga. 860, 861 (494 SE2d 322) (1998). See OCGA § 16-2-20 (defining parties to a crime); Flournoy v. State, 294 Ga. 741, 745 (755 SE2d 777) (2014) ("While [§ 16-2-20] 'does not use the word "conspiracy" it is plain that it embodies the theory of conspiracy insofar as it renders one not directly involved in the commission of a crime responsible as a party thereto.'" (citation omitted)); Navarrete v. State, 283 Ga. 156, 158 (656 SE2d 814) (2008) (explaining that under § 16-2-20, a jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with other perpetrators before, during, and after the crimes). Consequently, a co-conspirator to a robbery may be convicted of armed robbery even if he did not have actual prior knowledge that his fellow conspirator intended to use a gun, where the use of an offensive weapon was naturally or necessarily done in furtherance of the robbery, see Hicks v. State, 295 Ga. 268, 272-273 (759 SE2d 509) (2014); the State is not required to prove which conspirator actually took

8

the victim's property, see <u>Welch v. State</u>, 235 Ga. 243, 244-245 (219 SE2d 151) (1975); and proof that a victim was shot and killed during the robbery is sufficient to support a felony murder conviction regardless of which conspirator fired the fatal shot, see <u>Williams v. State</u>, 276 Ga. 384, 384-385 (578 SE2d 858) (2003).

Although application of these principles would be sufficient to sustain Appellant's convictions, the State did not need to rely solely on the foreseeability that one of Appellant's co-conspirators might use an actual gun to effectuate their plan to rob the three victims, because armed robbery does not require the use of an actual gun. Armed robbery requires "use of an offensive weapon, *or any replica, article, or device having the appearance of such weapon*." OCGA § 16-8-41 (a) (emphasis added). And the indictment in this case charged Appellant and his co-conspirators with armed robbery "by use of a handgun, the same being an offensive weapon, and an article having the appearance of such weapon." The second part of this allegation applied directly to Appellant, who admitted during his police interview that he had concealed his cellphone inside his sweatshirt and extended his arm towards the victims so that it looked like he had a gun, even demonstrating for the interviewing detectives

9

what he meant. Thus, the evidence was sufficient to convict Appellant of armed robbery even without regard to Brown's use of an actual gun. See, e.g., Martin v. State, 264 Ga. App. 813, 813-815 (592 SE2d 483) (2003) (upholding armed robbery conviction where the article having the appearance of an offensive weapon was the defendant's hand in his coat pocket); Miller v. State, 223 Ga. App. 453, 453-454 (477 SE2d 878) (1996) (upholding armed robbery conviction where the article that had the appearance of an offensive weapon was the defendant's hand wrapped in a shirt). See also Moody v. State, 258 Ga. 818, 820 (375 SE2d 30) (1989) (noting that "the purpose of using 'any replica, article, or device having the appearance of [an offensive] weapon' is to create a reasonable apprehension on the part of the victim that an offensive weapon is being used").

Accordingly, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized in Division 1 above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the armed robbery of McCarter and the felony murder of Jones and Jackson based on armed robbery. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20; Vega v. State, 285 Ga.

10

32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

3.    Appellant also contends that the trial court erred in denying his motion for new trial on the "general grounds."  See OCGA §§ 5-5-20 and 5-5-21.[3]  Specifically, Appellant asserts that the trial court failed to evaluate the credibility of the witnesses and to weigh the evidence in deciding whether to exercise its discretion to grant a new trial in its role as the so-called "thirteenth juror."  See White v. State, 293 Ga. 523, 524 (753 SE2d 115) (2013) ("In exercising that discretion, the trial judge must consider some of the things that she cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence.").

The trial court's order denying Appellant's new trial motion said only: "The Defendant's Motion for New Trial having been read and considered and

---

[3] OCGA § 5-5-20 says:  "In any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity, the judge presiding may grant a new trial before another jury."  OCGA § 5-5-21 says:  "The presiding judge may exercise a sound discretion in granting or refusing new trials in cases where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding."

11

a motion hearing having taken place on the 3rd day of September, 2013, said motion is hereby DENIED." Although the order did not explicitly state that the court was exercising its broad discretion as the thirteenth juror in deciding the motion, it is well-established that this Court

> must presume that the trial judge knew the rule as to the necessity of exercising his discretion, and that he did exercise it . . . . [W]e can not assume, in the absence of positive evidence to the contrary, that the judge knowingly declined to exercise his discretion.

Martin & Sons v. Bank of Leesburg, 137 Ga. 285, 291 (73 SE 387) (1911). Thus, where a trial judge ruling on a new trial motion enters an order that, "without more, recites that the new trial is refused or denied, this will be taken to mean that [the judge] has in the exercise of his discretion approved the verdict." Wilder v. State, 193 Ga. 337, 338 (18 SE2d 546) (1942).

> As we recently said in a case involving a similar summary denial order:

> Nothing in this order indicates that the trial court failed to "perform [ ] its 'duty to exercise its discretion and weigh the evidence' in its consideration of the general grounds." The court did not state the incorrect standard in its order, and nothing in the record indicates that the court was unaware of its responsibility. Indeed, the record demonstrates the opposite; during the hearing on the motion for new trial, the court's attention was specifically called to OCGA §§ 5-5-20 and 5-5-21, and that consideration of the general grounds thereunder involved different issues than merely the sufficiency of the evidence . . . . The court clearly recognized that, in its

12

> discretion, it could grant a new trial under the authority of OCGA §§ 5-5-20 and 5-5-21, and chose not to do so.

Allen v. State, 296 Ga. 738, 741 (770 SE2d 625) (2015) (citations omitted).

This is not a case where the trial court explicitly declined to consider the credibility of the witnesses in denying the defendant's motion for new trial on the general grounds. See Choisnet v. State, 292 Ga. 860, 861 (742 SE2d 476) (2013); Alvelo v. State, 288 Ga. 437, 439 (704 SE2d 787) (2011). Nor did the trial court in this case make clear its belief that it had no discretion to grant a new trial despite disagreeing with the jury's verdict. See Manuel v. State, 289 Ga. 383, 386 (711 SE2d 676) (2011); Mills v. State, 188 Ga. 616, 619 (4 SE2d 453) (1939). Accordingly, this enumeration of error is meritless.

Judgment affirmed. All the Justices concur.