305 Ga. 600
FINAL COPY

S18A1282.  BROOKS v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Nicholas Brooks was convicted of felony murder and other crimes in connection with the shooting death of Jason Blount.  Appellant contends that the evidence presented at his trial was legally insufficient to overcome his defense of coercion; that the prosecutor committed misconduct by introducing into evidence an edited version of Appellant's video-recorded police interview; and that his trial counsel provided ineffective assistance by failing to object to the admission of the recording and by inadequately informing him of his right to testify.  Appellant's claims are meritless, so we affirm.[1]

---

[1] The victim was killed on April 6, 2010.  About two months later, a Houston County grand jury indicted Appellant, Michael Cossette, and Kelly Williamson for three counts of felony murder (predicated on burglary, attempted armed robbery, and aggravated assault), burglary, attempted armed robbery, aggravated assault, and three counts of possession of a firearm during the commission of a crime based on the three predicate felonies.  Appellant's case was severed for trial, which began on April 25, 2011.  Several months before the trial, Cossette pled guilty to felony murder based on burglary and burglary and was sentenced to serve life in prison.  A few days after the trial ended, Williamson pled guilty to burglary, aggravated assault, and one firearm offense.  Both co-defendants testified for the State.  On April 29, the jury found Appellant guilty of all charges, and the trial court sentenced him to serve life in prison for felony murder based on burglary, five consecutive years for the firearm count based on burglary, and a five-year concurrent term for

1.    Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following.  On the afternoon of April 5, 2010, Appellant did some flooring work at a trailer owned by David Colleps.  After leaving Colleps's trailer, Appellant hung out and smoked methamphetamine with his acquaintance Kelly Williamson and her friend Michael Cossette, whom Appellant had met earlier that day, at a nearby trailer that belonged to a mutual friend identified only as "Carlos."  Around 2:00 a.m., Appellant left briefly to

the firearm count based on attempted armed robbery.  See State v. Marlowe, 277 Ga. 383, 385-386 (589 SE2d 69) (2003).  The court purported to merge the remaining verdicts; those rulings have not been challenged on appeal.  See Dixon v. State, 302 Ga. 691, 698 (808 SE2d 696) (2017).

Through new counsel, Appellant filed a timely motion for new trial on May 6, 2011.  About six months later, Appellant retained different appellate counsel, who filed a motion on April 2, 2012, requesting that Appellant be declared indigent.  The trial court did not immediately rule on that motion.  On August 4, 2014, counsel filed an amended motion for new trial.  After an evidentiary hearing, the court denied that motion on December 19, 2014.  Appellant filed a notice of appeal on January 12, 2015, which was incorrectly directed to the Court of Appeals.  On March 18, 2015, the trial court denied the April 2012 motion requesting that Appellant be declared indigent, finding that it was "no longer timely" because it was three years old and that it "lack[ed] information necessary for consideration of the requested relief."  On May 19, 2017, Appellant's second appellate counsel filed an amended notice of appeal properly directed to this Court.  Three days later, Appellant, acting pro se, purported to file in the trial court a motion for an out-of-time appeal and a "Notice of Withdrawal of Counsel" requesting that his attorney be removed from the case.

Appellant's January 2015 appeal was docketed in this Court on October 17, 2017, but no brief was filed for Appellant.  On January 16, 2018, we issued an order striking the case from our docket and remanding it to the trial court with direction to determine whether Appellant was in fact indigent and in need of new appointed counsel and whether he validly chose to proceed pro se in his appeal.  On April 9, 2018, the trial court held a hearing on the matter, at which Appellant was represented by third appellate counsel whom his family had retained.  That same day, the court entered an order holding that Appellant was indigent but was not in need of new appointed counsel because his retained attorney planned to continue representing him.  The court also found that Appellant had not validly chosen to proceed pro se, noting that he had now been informed of his right to appointed counsel for his appeal.  The appeal was then redocketed in this Court for the August 2018 term and orally argued on September 11, 2018.

2

get his pickup truck, returning to Carlos's with Williamson's sister Carrie. At some point, Appellant, Williamson, and Cossette went into a bedroom and began talking about how they needed money.

When Appellant and Williamson told Cossette that Colleps kept a lot of money and meth in his trailer, Cossette suggested that they rob Colleps, and Appellant told Cossette that he had just gotten out of prison and could be trusted. Appellant and Williamson, who also had been in Colleps's trailer, drew a diagram of the trailer on a piece of cardboard.[2] The three planned that Williamson would be the getaway driver and Appellant would make sure that everyone in the trailer stayed on the floor while Cossette searched for money and meth. Appellant, Cossette, and Williamson then went to Williamson's house, where Cossette made a mask out of a pair of green sweatpants and Appellant made his own mask out of a black shirt.

Around 4:30 a.m., Williamson drove Appellant and Cossette to Colleps's trailer in Appellant's truck. Appellant and Cossette put on their masks, and after

---

[2] As discussed in footnote 1 above, Cossette and Williamson were indicted with Appellant and testified for the State at his trial pursuant to plea agreements. While Cossette testified that Appellant and Williamson drew the diagram of Colleps's trailer, Williamson told the jury that she and Cossette, not Appellant, made the drawing.

Cossette knocked loudly on the door of the trailer, Appellant kicked in the door, entered, and stood in the living room as Cossette followed him in brandishing a 9mm pistol. Colleps and his cousin fled through a bedroom window when they heard the assailants. His friend Jason Blount and Blount's fiancée were also staying in the trailer that night. Cossette ordered them to get down on the floor, and Blount's fiancée, who was in a hallway, complied. When Blount remained standing in the kitchen, Cossette hit him on the head with the pistol and began searching the trailer for money and meth. Blount then threw some tools that were strewn around the kitchen at Appellant, who was still standing in the living room. Cossette fired several rounds toward Blount, who was hit once in the chest. Cossette and Appellant then fled from the trailer.

Blount died moments later from his gunshot wound. His autopsy later showed that he had been shot by a 9mm pistol from a distance of several feet. Blount's fiancée was not injured; she could not identify the two intruders, but said that both were men wearing masks, one of which was green, and both men were armed with handguns.[3]

---

[3] Colleps's neighbor also testified that she saw both assailants carrying guns; Cossette and Williamson said that Appellant was unarmed.

As Williamson drove Appellant and Cossette back to Carlos's trailer, Cossette took the two remaining bullets out of his pistol and threw them into the woods. Appellant and Williamson discussed parking Appellant's truck behind Carlos's trailer so no one would see it. Once in the trailer, Appellant told Cossette that he would burn both of the masks, and he ripped up the diagram of Colleps's trailer and put the pieces of the diagram and the two masks in a plastic bag. Cossette and Williamson then went to sleep while Appellant hung out in the living room with Carrie and Carlos.

Later that day, Williamson met with investigators, and she eventually gave them Appellant's and Cossette's names. Cossette was then arrested at a friend's house, where investigators found two firearms, one of which was Cossette's empty 9mm pistol. That evening, the investigators spotted Appellant driving his truck, but moments later, they found the truck abandoned. The next day, Appellant called an investigator and said that he was scared and hiding out in the Atlanta area with his stepmother; after he failed to turn himself in as requested, officers located and arrested him and his stepmother as they were leaving a motel in Locust Grove.

After his arrest, Appellant was interviewed; the State played a redacted

5

version of the video recording of the interview for the jury. Appellant told the following story. In the bedroom of Carlos's trailer, Cossette pulled out a 9mm pistol and told Appellant and Williamson that "they [were] going to go rob somebody." When Appellant said he did not want to get involved, Cossette pointed his pistol at Appellant and told him that he "was going to f\*\*king do it or [Cossette] was going to f\*\*king kill [him]" and that Cossette knew where Appellant's kids lived. Appellant "didn't say nothing" because he "didn't know what to do; [he] was scared." Cossette wanted him to wear a green mask, but he decided to make a black mask for himself. When they arrived at Colleps's trailer, Cossette kicked in the door and hit Blount with his pistol, and Appellant, who was standing in the living room, told Blount, "I'm not going to do anything." Blount then threw a drill at Cossette, and Cossette fired a few rounds and shot Blount. Back at Carlos's, Cossette examined his pistol, which still had two bullets left in it, and told Appellant to get rid of the masks. Appellant put them in a plastic bag, along with a diagram of Colleps's trailer that Cossette and Williamson had drawn. When everyone fell asleep, Appellant left Carlos's and threw the plastic bag in a trash can outside of a friend's house. (Investigators later found the bag containing the green mask, the black mask, and the torn

6

diagram in the trash can.) Appellant then hid from law enforcement because he was scared of what Cossette would do to him or his family.

Appellant did not testify at trial. Relying primarily on his interview, the defense theory was that Cossette had coerced Appellant into participating in the crimes. Cossette and Williamson both testified, however, that Cossette never threatened Appellant and never pointed his pistol at Appellant. Williamson testified that Appellant initially said that he did not want to get involved with the burglary, but after Cossette said he needed Appellant's help, Appellant "just went along with it." Williamson's sister Carrie testified that she overheard Appellant, Cossette, and Williamson planning the burglary and that Appellant acted "like he was up for it." In addition, Appellant's friend testified that several hours after the murder, Appellant told her that he had been in a house while it was robbed but never mentioned that he had been forced at gunpoint to participate in the crimes.

2. Appellant contends that the evidence presented at trial was legally insufficient to overcome his affirmative defense of coercion. As discussed above, when viewed in the light most favorable to the jury's verdicts, the evidence showed that Appellant, who had been in Colleps's trailer on the

7

afternoon before the shooting, told Cossette that there was money and meth in the trailer; he then planned the burglary of the trailer with Cossette and Williamson, telling them that he could be trusted, drew a diagram of the trailer with Williamson, and as Appellant later admitted in his statement to investigators, made his own mask so that no one in the trailer would recognize him. After the co-defendants arrived at the trailer in Appellant's truck, he kicked in the door and entered the trailer, armed with a handgun; and when Cossette shot Blount after Blount threw tools at Appellant, Appellant fled the trailer with Cossette and Williamson. Appellant then stayed to hang out at Carlos's trailer after Cossette and Williamson went to sleep; as he later admitted, he voluntarily disposed of the diagram and two masks. He also fled from investigators after they spotted him driving his truck on the evening after the shooting.

At trial, Cossette, Williamson, and Carrie testified that Appellant was a willing participant in the crimes, and Appellant's friend testified that he had told her about being in a house during a robbery but never mentioned that he had been forced at gunpoint to commit the crimes. This evidence was sufficient to authorize a rational jury to reject Appellant's coercion defense and find him

guilty beyond a reasonable doubt of the crimes of which he was convicted. See

Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979);

Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("It was for the jury to

determine the credibility of the witnesses and to resolve any conflicts or

inconsistencies in the evidence." (citation and punctuation omitted)); Conaway

v. State, 277 Ga. 422, 423 (589 SE2d 108) (2003) (concluding that the evidence

supporting the appellant's convictions was legally sufficient, notwithstanding

his testimony that he was coerced to commit the crimes, which "at most created

a conflict with other evidence that showed his participation in the crimes was

voluntary"). See also OCGA § 16-2-20 (defining parties to a crime); Butts v.

State, 297 Ga. 766, 770 (778 SE2d 205) (2015) (explaining that under OCGA

§ 16-2-20, a jury may infer a common criminal intent from the defendant's

presence, companionship, and conduct with another perpetrator before, during,

and after the crimes).[4]

---

[4] We therefore need not decide in this case whether the defense of coercion was even available as to Appellant's felony murder charges, particularly as the jury was charged on that defense using the statutory language, without objection by the State. See OCGA § 16-3-26 ("A person is not guilty of a crime, except murder, if the act upon which the supposed criminal liability is based is performed under such coercion that the person reasonably believes that performing the act is the only way to prevent his imminent death or great bodily injury."). See also Kelly v. State, 266 Ga. 709, 711 (469 SE2d 653) (1996) (reserving the question).

3.     During direct examination of one of the police investigators who interviewed Appellant, the State tendered the original, over-two-hour-long video recording of the interview, which was admitted into evidence without objection. When the prosecutor asked the trial court's permission to play the recording for the jury, the court called the attorneys to the bench, and the prosecutor explained that he planned to play an edited version of the video that was about an hour and 15 minutes long. The prosecutor told the court that the State had redacted parts of the recording that referenced Appellant's prior criminal record, probation status, and other "objectionable" content. When Appellant's counsel told the court that she had not seen the redacted video, the prosecutor explained that the State was not able to get the recording redacted and to the defense before the trial began. Appellant's counsel agreed to watch the edited recording over a lunch recess. After lunch, the prosecutor played the redacted version of the interview for the jury, and Appellant's attorney did not object. Neither the original nor the redacted recording was given to the jury during its deliberations.

Appellant now contends that the prosecutor committed misconduct by using the edited version of the interview recording. Specifically, Appellant argues that the State removed "crucial" statements in the interview that provided

10

important context; that the State edited Appellant's statement, "If I had a pistol I would have shot that motherf**ker [Cossette] for pointing a gun at me and telling me I had to do something," so that the jury heard "If I had a pistol I would have shot that" before a "blackout" transition to another segment of the recording; and that the various "jumping" and "fading" transitions between sections of the recording highlighted changes in Appellant's mood during the interview.

Because Appellant did not raise this claim of prosecutorial misconduct at trial, it was not preserved for appeal. See Cushenberry v. State, 300 Ga. 190, 195 (794 SE2d 165) (2016). Indeed, Appellant failed to raise this claim in his motion for new trial or during the hearing on the motion, so the trial court never ruled on it. See McClendon v. State, 299 Ga. 611, 616 (791 SE2d 69) (2016) ("Because [appellant] raises an issue on appeal that was not presented [to] or ruled upon by the trial court, his argument is not preserved for review by this Court.").

In any event, "'when a defendant alleges a factually specific claim of prosecutorial misconduct, the defendant must show actual misconduct and demonstrable prejudice to his right to a fair trial in order to reverse his

conviction.'" <u>Cushenberry</u>, 300 Ga. at 195 (citation omitted). Pretermitting whether the prosecutor acted altogether properly, Appellant has not demonstrated prejudice. A comparison of the original recording of his interview and the edited version shows that many of the edits omitted references to other bad acts or crimes that Appellant had committed. Additional edits cut several minutes during which Appellant sat quietly alone in the interview room or brief periods of time when the interview was interrupted while investigators addressed unrelated matters. And although it is less clear why the State redacted other sections of the recording, the omitted statements and reactions by Appellant that were relevant to his defense were repeated in other parts of the recording.

For example, the edited version omits a few brief segments during which Appellant cried and said that he was afraid. But the jury saw numerous other instances during the recording in which Appellant repeatedly cried and said that he was afraid of Cossette. And although the State unaccountably edited Appellant's statement, "If I had a pistol I would have shot that motherf\*\*ker for pointing a gun at me and telling me I had to do something," in such a way that the jury heard "If I had a pistol I would have shot that," the jurors surely

inferred that Appellant was talking about shooting Cossette for allegedly coercing him. Minutes earlier in the recording, the jury heard Appellant tell investigators, "If I had a pistol, I would have f\*\*king shot [Cossette]. I don't know whether that's incriminating or not, but I would have, just because [Cossette] forced me to do something I didn't want to do." As for Appellant's assertion that the various transitions between edited sections of the recording highlighted his shifts in mood, the original recording of the interview shows that Appellant's demeanor quickly changed from angry to depressed to relieved as he recounted his story that Cossette forced him at gunpoint to commit the crimes.

Under these circumstances, Appellant has not proved his claim of prosecutorial misconduct. See id. He also has not demonstrated that the State violated his right to due process through the knowing presentation of material false evidence, see Napue v. Illinois, 360 U.S. 264, 269 (79 SCt 1173, 3 LE2d 1217) (1959), or the concealment of material exculpatory evidence, see Brady v. Maryland, 373 U.S. 83, 87 (83 SCt 1194, 10 LE2d 215) (1963).

4.  Appellant also asserts that his trial counsel provided ineffective assistance by failing to adequately review and object to the edited recording of

his police interview. To prove ineffective assistance, Appellant must show both that his counsel's performance was professionally deficient and that, but for the unprofessional performance, there is a reasonable probability that the outcome of the proceeding would have been different. See Strickland v. Washington, 466 U.S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984). We need not review both parts of this test if Appellant fails to prove one of them. See Stripling v. State, 304 Ga. 131, 138 (816 SE2d 663) (2018).

Pretermitting whether Appellant preserved this claim for review, he cannot establish that any deficiency in trial counsel's failure to object to the edited recording of the interview likely affected the outcome of his trial. As discussed in Division 3 above in relation to Appellant's prosecutorial misconduct claim, although the State omitted from the recording moments that were relevant to his defense, those brief snippets were cumulative of other portions that were played for the jury. Accordingly, Appellant's ineffective assistance claim is without merit. See Eller v. State, 303 Ga. 373, 384 (811 SE2d 299) (2018) (concluding that the appellant could not show prejudice from any deficiency in trial counsel's failure to introduce evidence that may have supported the appellant's defense, because the evidence was cumulative of other evidence that was

14

presented to the jury).

5.    Finally, Appellant contends that his trial counsel provided ineffective assistance by failing to adequately inform him of his right to testify. In its order denying Appellant's motion for new trial, however, the trial court found credible counsel's testimony at the motion hearing that she had advised Appellant of his right to testify; that it was not in his best interest to testify because his account of the crimes could be presented to the jury through the recorded interview without exposing him to cross-examination, while if he testified, the prosecutor would impeach him with his two prior burglary convictions; and that the decision to testify was ultimately his to make. Appellant has therefore failed to show that his trial counsel performed deficiently.  See, e.g., Turner v. State, 300 Ga. 513, 515 (796 SE2d 698) (2017) (rejecting an ineffective assistance claim based on trial counsel's purported failure to inform the appellant of his right to testify, where counsel testified that he had discussed the appellant's right to testify with him, told him that it was his decision to make, and advised him that the prosecutor could cross-examine him about his criminal history); Hamilton v. State, 274 Ga. 582, 589 (555 SE2d 701) (2001) (concluding that counsel's strategic decision to advise the appellant not

to testify was reasonable because the State would cross-examine him about his prior similar crimes).  In addition, although Appellant testified at the motion for new trial hearing that he would have testified at trial if his attorney had informed him that it was his decision to make, he failed to present evidence to show what his trial testimony would have been or that it would have differed from the story that had already been presented to the jury through his recorded interview. Thus, he has not established Strickland prejudice.  See, e.g., Sims v. State, 278 Ga. 587, 591 (604 SE2d 799) (2004).

Judgment affirmed.  All the Justices concur.

Decided March 11, 2019 — Reconsideration denied March 27, 2019.

Murder. Houston Superior Court. Before Judge Lukemire.

Francis R. Dixson III, for appellant.

George H. Hartwig III, District Attorney, Daniel P. Bibler, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Matthew B. Crowder, Assistant Attorneys General, for appellee.