304 Ga. 343
FINAL COPY

S18A0818. SESSIONS v. THE STATE.

MELTON, Presiding Justice.

Following a jury trial, Thomas Sessions, Jr., appeals his convictions for malice murder, aggravated assault, and possession of a firearm during the commission of a felony,[1] contending that the evidence was insufficient to

---

[1] On November 4, 2013, Sessions was indicted for malice murder, felony murder, aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. Following a jury trial ending on August 28, 2014, Sessions was found guilty of all counts except possession of a firearm by a convicted felon. The possession of a firearm by a convicted felon charge was not reflected on the verdict form, and the jury did not return a verdict on this charge at the conclusion of trial. The trial court sentenced Sessions to life imprisonment for malice murder, twenty concurrent years for aggravated assault, and five consecutive years for possession of a firearm during the commission of a felony. Although the trial court purported to merge felony murder into the malice murder conviction, the conviction for felony murder was actually vacated by operation of law. Malcolm v. State, 263 Ga. 369 (4) (434 SE2d 479) (1993). On September 8, 2014, Sessions filed a motion for new trial, which was amended on December 9, 2014 and January 14, 2017. The motion was denied on February 27, 2017. Sessions filed a timely notice of appeal, and his case, submitted on the briefs, was docketed to the April 2018 term of this Court.

support the verdict and that the trial court committed certain evidentiary errors. For the reasons set forth below, we affirm.

1. Viewed in the light most favorable to the verdict, the facts show that, on the evening of August 9, 2013, Sessions and Douglas Cameron were with a group of people at the home of Adrian Dunham. Sessions asked Cameron to give him some drugs, which Sessions offered to pay for at a later time. Cameron refused. Angered, Sessions left, retrieved a shotgun from his home, and returned to Dunham's house approximately twenty minutes later. Sessions approached Cameron from behind and then shot him in the back. Afterwards, Sessions walked back to his own house, and he tossed the shotgun into a small lot nearby. The shotgun was later recovered by police, and Sessions's fingerprints and DNA were on it. When police arrived at the scene of the shooting, Cameron, who was unarmed, was dying in the street, with Dunham watching over him.

Testimony from witnesses at the scene supported this version of events. Darius Mosley, who was present during the conversations between Cameron and Sessions about Sessions's desire to acquire drugs, testified that he did not hear Cameron make any threats or see Cameron with a gun at any point during that evening. In addition, Mosley saw Sessions come toward the unarmed victim

from behind with a shotgun moments before the shooting occurred. Also, Debra Dunson testified that she saw Sessions approach the unarmed victim from behind while holding a gun. Dunson further testified that Cameron tried to run away before Sessions shot him in the back. Margo Grady, who was also present on the evening of the shooting, heard Sessions and Cameron talking about money, but she did not see Cameron with a gun at any point or hear Cameron make any threats to Sessions.

After being arrested on the day of the shooting and read his Miranda rights, Sessions initially told police that he had been at Dunham's home, but he repeatedly denied shooting Cameron. At the conclusion of the interview, Sessions's hands were tested for gunshot residue, and the results were positive. During trial, Sessions testified in his own defense, changed his story, and contended that he shot Cameron in self-defense. Specifically, Sessions claimed that Cameron incorrectly believed that Sessions had not repaid a certain debt to him, and Cameron threatened Sessions at gunpoint that he would kill his whole family if he did not repay it. Sessions testified that this act caused him to return home, retrieve his shotgun, and then confront and kill Cameron.

This evidence was sufficient to enable the jury to find Sessions guilty of

3

the crimes for which he was convicted beyond a reasonable doubt. See <u>Jackson v. Virginia</u>, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). See also <u>Hoffler v. State</u>, 292 Ga. 537, 539 (1) (739 SE2d 362) (2013) ("Issues of witness credibility and the existence of justification are for the jury to determine, and it is free to reject a defendant's claim that he acted in self-defense.").

2. Sessions contends that the trial court erred by preventing him from eliciting evidence at trial to show that Cameron was a member of a certain street gang. Sessions argues that Cameron's gang affiliation caused him to take Cameron's threats more seriously and to ultimately act in self-defense. Even if the trial court erred in excluding this evidence, however, this exclusion was harmless.

As an initial matter, the record is somewhat equivocal as to whether the trial court *completely* precluded Sessions from eliciting the evidence about which he complains. Prior to trial, the State filed a motion in limine to exclude any references to Cameron's possible gang affiliation. Sessions argued that he wanted to present expert testimony establishing that Cameron was a member of a gang in order to explain why Sessions believed that Cameron would carry out his threats and why Sessions's actions were justified as self-defense. After

4

considering this argument, the trial court actually ruled that: "I am not going to let you bring in the gang testimony, and, if you do, I'm going to let [the State] bring in testimony about [the defendant's] propensity for violence" under OCGA § 24-4-404 (a) (2).[2] So, to the extent that Sessions contends that he was wholly prevented from presenting evidence that Cameron was affiliated with a gang, his contention is not completely supported by the transcript.

In addition, the trial court stated two additional bases for its ruling. The trial court found that Sessions had presented no actual proof that Cameron was

---

[2] OCGA § 24-4-404 provides:
(a) Evidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion, except for: (1) Evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same; or if evidence of a trait of character of the alleged victim of the crime is offered by an accused and admitted under paragraph (2) of this subsection, evidence of the same trait of character of the accused offered by the prosecution; (2) Subject to the limitations imposed by Code Section 24-4-412, evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused or by the prosecution to rebut the same; or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor; or (3) Evidence of the character of a witness, as provided in Code Sections 24-6-607, 24-6-608, and 24-6-609.

5

affiliated with a gang, Furthermore, the trial court found that Sessions's self-defense claim, that he left the scene, waited twenty minutes, and returned with a shotgun to confront Cameron, was not a viable self-defense claim, though the trial court did ultimately charge the jury on the law of self-defense.

We agree with the trial court to the extent that it determined that Sessions made no viable claim of self-defense. Sessions testified to the following version of events: At Dunham's house, Cameron approached him about a debt of $50. Sessions told Cameron that he had already repaid him, but Cameron insisted that he pay the debt again. After Sessions refused, he and Cameron had "words back and forth." Sessions then decided to leave Dunham's house, but, when Sessions stepped out onto the front porch, Cameron put a pistol to his head. At that time a friend of Cameron's removed money from Sessions's pocket. Cameron then warned Sessions that, if he reported anything to the police, Cameron and his friends would kill Sessions and his whole family. Sessions then left Dunham's house, went to his own home, and retrieved a shotgun. Sessions took the shotgun and returned to Dunham's house in order to confront Cameron. Sessions approached from the side of Dunham's home with the shotgun raised and pointed at Cameron, who was sitting on the front steps. Cameron's friend

immediately ran away. With the shotgun still pointed at Cameron, Sessions commanded, "Man, give me my money and don't be threatening my family no more." Sessions looked away for a moment, but, when he looked back, he believed that Cameron was pulling a pistol from his left side. Sessions then shot Cameron in the back, left the scene, and disposed of the shotgun in a vacant lot.

Under Sessions's own version of events, he could not have acted in self-defense. Self-defense is a statutory defense. OCGA § 16-3-21 (a) provides:

> A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

OCGA § 16-3-21 (b) (3), however, states that the defense of self-defense is not available to a person who "[w]as the aggressor or was engaged in a combat by agreement unless he withdraws from the encounter and effectively communicates to such other person his intent to do so and the other, notwithstanding, continues or threatens to continue the use of unlawful force."

Here, Sessions maintained that, after Cameron made threats against his family, Sessions left the scene for approximately twenty minutes, retrieved a shotgun, and returned to the scene to stop Cameron from carrying out his threats in the future. Sessions further maintained that he was entitled to prove Cameron's gang affiliation to support the reasonableness of his belief that Cameron would ultimately make good on his threats. But, Sessions was not subject to an imminent threat of unlawful force. To the contrary, Cameron threatened some future harm from which Sessions simply walked away. Then, after twenty minutes, Sessions pursued Cameron with a shotgun and initiated the deadly confrontation. Under these circumstances, Sessions did not act in self-defense. See, e.g., Gravitt v. State, 279 Ga. 33, 35 (2) (608 SE2d 202) (2005) (justification not allowed as a defense where only danger was the possibility of "future retribution" and not "present and immediate violence at the time of the homicide").

Because it is plain that Sessions could not have acted in self-defense under the specific facts of this case, even if we assume that the evidence of Cameron's gang affiliation was admissible, Sessions was not harmed by the exclusion of that evidence under these facts. Whether that evidence were admitted or not,

Sessions was still the initial aggressor who was responding to threats of future

harm, not imminent use of unlawful force.[3]

3. Sessions contends that the trial court violated former OCGA § 17-8-57[4]

by commenting on the veracity of a witness and Sessions's guilt. We disagree.[5]

---

[3] We need not address the other bases stated by the trial court for exclusion of this evidence.

[4] At the time of Sessions's trial in 2014, this statute stated:
It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused. Should any judge violate this Code section, the violation shall be held by the Supreme Court or Court of Appeals to be error and the decision in the case reversed, and a new trial granted in the court below with such directions as the Supreme Court or Court of Appeals may lawfully give.

[5] Effective July 1, 2015, OCGA § 17-8-57 was amended to say:
(a) (1) It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused. (2) Any party who alleges a violation of paragraph (1) of this subsection shall make a timely objection and inform the court of the specific objection and the grounds for such objection, outside of the jury's hearing and presence. After such objection has been made, and if it is sustained, it shall be the duty of the court to give a curative instruction to the jury or declare a mistrial, if appropriate. (b) Except as provided in subsection (c) of this Code section, failure to make a timely objection to an alleged violation of paragraph (1) of subsection (a) of this Code section shall preclude

9

The record shows that, at trial, defense counsel asked Dunham if anyone came to him inquiring about money or firearms after the shooting. Apparently, defense counsel wished to raise an inference that Cameron had a weapon at the time of the shooting and that his friends thought Dunham might have kept it. Dunham testified in response that he was "jumped" several days after the shooting. The State interposed a hearsay objection, but the trial court responded that "[Dunham's] testifying that somebody tried to jump on him is not hearsay." Questioning continued, and Dunham stated that, several days after the shooting, friends of Cameron "jumped" him because they incorrectly believed that Dunham went into Cameron's pocket and took firearms and money while Cameron was dying. The State objected again. This time, the trial court sustained the objection, ruling that "the fact that some guys came over there is

appellate review, unless such violation constitutes plain error which affects substantive rights of the parties. Plain error may be considered on appeal even when a timely objection informing the court of the specific objection was not made, so long as such error affects substantive rights of the parties. (c) Should any judge express an opinion as to the guilt of the accused, the Supreme Court or Court of Appeals or the trial court in a motion for a new trial shall grant a new trial.

10

not hearsay," but "[Dunham's] talking about what they were trying to do is pure hearsay" and "his saying that they were friends of Cameron is also hearsay." Thereafter, without objection, the trial court instructed the jury:

> Hearsay has what we call no probative value. It's not any good as evidence. And his saying that they were friends of the victim is also hearsay. So none of that is relevant, and I'm instructing you now that none of this testimony about these guys coming over to jump on him is relevant to the issue of whether the defendant murdered, or committed aggravated assault, or anything else he's charged with on the victim.

Sessions contends that this instruction violated OCGA § 17-8-57.

We have previously explained that the remarks of a judge explaining "a reason for his ruling are neither an expression of opinion nor a comment on the evidence." (Citations and punctuation omitted.) Butler v. State, 290 Ga. 412, 416 (4) (721 SE2d 876) (2012). See also Boyd v. State, 286 Ga. 166, 168 (3) (686 SE2d 109) (2009). That is all the judge did in this case — he merely gave the reasons for his evidentiary ruling that the disputed testimony was hearsay and, thereafter, instructed the jurors to disregard the hearsay evidence. Despite Sessions's arguments to the contrary, the trial court did not comment on either the veracity of the witness or the guilt of Sessions. The trial court did not abuse its discretion in any of this. Moreover, at the close of trial, the trial court

11

cautioned the jury that, "[b]y no ruling or comment that the [c]ourt has made during the progress of this case has the [c]ourt intended to express any opinion upon the facts of the case, upon the credibility of the witnesses, upon the evidence, or upon the guilt or innocence of the defendant." There was no violation of OCGA § 17-8-57. See <u>Butler</u>, supra.

<u>Judgment affirmed. Hines, C. J., Benham, Hunstein, Nahmias, Blackwell, Boggs, and Peterson, JJ., concur</u>.

Decided August 27, 2018.

Murder. Troup Superior Court. Before Judge Sakrison.

Bentley C. Adams III; Clark C. Adams, Jr., for appellant.

John H. Cranford, Jr., District Attorney, Monique L. Kirby, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Vanessa T. Meyerhoefer, Assistant Attorney General, for appellee.