310 Ga. 310
FINAL COPY

S20A0799. HORTON v. THE STATE.

BOGGS, Justice.

Quentin Lee Horton was convicted of malice murder, arson in the first degree, and related crimes in connection with the stabbing death of his neighbor Jeffrey Hagan and the burning of Hagan's home. Horton was sentenced to serve life in prison plus five years without the possibility of parole, and he appeals, asserting five enumerations of error. For the reasons stated below, we affirm.[1]

---

[1] The crimes occurred between the evening of February 7, 2015 and the early morning of February 8, 2015. On August 23, 2016, a Candler County grand jury indicted Horton for malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), arson in the first degree (Count 4), burglary in the first degree (Count 5), theft by taking (Count 6), theft by receiving stolen property (Count 7), concealing the death of another (Count 8), and possession of a firearm by a convicted felon (Count 9). Counts 6 and 7 were nol prossed by the State. At a trial from November 14 to 16, 2016, the jury found Horton guilty on Counts 1 through 5 and Count 8; Count 9 was bifurcated, and after a brief trial on that count the jury found Horton guilty. The trial court sentenced Horton as a recidivist to serve life without the possibility of parole for malice murder (Count 1), twenty years each without parole for Counts 4 and 5, to be served concurrently, ten years without parole for Count 8, to be served concurrently, and five years without parole for Count 9, to be served consecutively to Count 1. The court merged Count 3 and purported to merge Count 2, although the felony murder count was actually vacated as a matter of

1. Construed in the light most favorable to the jury's verdicts, the evidence presented at Horton's trial showed that Horton lived in a travel trailer behind his mother's mobile home on Webb Circle near Metter in Candler County; he had access to his mother's home as well. Hagan lived in a mobile home next door to Horton's mother. At 3:20 a.m. on Sunday, February 8, 2015, a Candler County deputy sheriff responded to a 911 call from a neighbor reporting that Hagan's home was on fire, and found the structure already "fully engulfed in flames." Metter Fire-Rescue firefighters arrived, and because of the presence of cars in the driveway they were concerned that individuals could be trapped in the home. While the initial effort "to push the fire back" was still underway, a search team entered the home but abandoned the search almost immediately

law. Through his trial counsel, Appellant filed a motion for new trial, which he amended with new counsel on December 10, 2018. After two evidentiary hearings, on November 25, 2019, the trial court granted Appellant's motion in part, amending Appellant's sentence by vacating the felony murder verdict rather than merging it, and denied the remainder of the motion. Appellant filed a timely notice of appeal, the case was docketed in this Court to the April 2020 term, and the case was orally argued on August 12, 2020.

because of the unstable floor and heavy smoke. As they retreated, they stumbled over Hagan's severely burned body on the kitchen floor. It did not appear that he was alive, but firefighters immediately dragged him from the home, sprayed his body with water to cool it and remove insulation and other debris that had fallen on him from the collapsing structure, and called emergency medical personnel, who confirmed that Hagan was dead. Firefighters also found Hagan's dog dead inside the home.

While investigators initially assumed that Hagan's death was a result of the fire, an autopsy performed on the following Tuesday, February 10, revealed that Hagan had 14 stab wounds to the chest and neck. The forensic pathologist determined that Hagan died as a result of the stab wounds before the fire, due to the absence of soot in his airways.

A fire investigator from the state Fire Marshal's office testified that the fire was arson, intended to destroy evidence of a homicide. While he had made an initial visit in the early morning hours of Sunday, while the fire was still smoldering, he returned on Tuesday

after he was told that the death was a homicide. He found signs that an accelerant was used in the living room of Hagan's home and called in a second investigator with a certified accelerant-detection dog trained to detect petroleum products. The dog alerted on three locations in the living room area, where the floor had collapsed, and when the fire investigators dug down into the area to obtain samples to send to the crime lab, they smelled "some type of accelerant" such as diesel fuel or gasoline. The samples tested negative, but the fire investigators explained that a dog can detect much lower levels of gasoline than laboratory equipment and that such an intense fire would destroy much of the evidence. A crime scene specialist photographed the scene and found a gasoline can at the rear of the house, lying on its side in the carport area. There were other gas cans nearby, but they were undisturbed and covered with dust.

Local investigators canvassed the neighborhood immediately after the fire and learned that Horton was apparently the last person to see Hagan alive on the night of the fire. After the results of the autopsy were known, a GBI agent interviewed Horton on

Tuesday, February 10, but did not reveal that the death was now being investigated as a homicide. Horton told the agent that on the day of the fire, he had contacted a man named David Brown about obtaining some cigarettes, but had not heard from him so he asked Hagan if he had any. Hagan waved him over to his house, gave him a pack of cigarettes, and showed him a new .22 rifle on an AR platform. Horton said they made plans to "sight in" the new rifle and were talking when David Brown arrived. Horton went back to his trailer to talk with Brown about the cigarettes and about selling him his travel trailer. Horton then returned to Hagan's residence, where they both began to drink heavily. At some point, a man named Kenneth Holloway called Hagan and wanted to come over, and Horton said he did not want to be there with Holloway so he returned home, sometime between 7:00 and 8:00 the same evening.[2]

---

[2] Both Brown and Holloway testified at trial. Brown confirmed that he met with Horton around 4:00 in the afternoon to deliver a pack of cigarettes and discuss the sale of Horton's trailer. He testified that Horton came from the victim's home and was wearing "a pair of khaki shorts, a white button-up dress shirt, and a pair of black sandals that were open in the back." Holloway

In a second interview on the same day, the GBI agent revealed to Horton that the case was being investigated as a homicide and that the .22 rifle he mentioned previously had not been recovered from the remains of the home. Horton gave a further description of the rifle, but added that other than seeing it before he met with Brown, "he didn't really handle it or see it much more after that." Horton also told the agent that he had a .22 rifle in his trailer and gave consent for the agent to search, but the rifle that the agent found was not the AR-type rifle Horton had described earlier. Horton also told the agents that he had been wearing a black sweat suit on the night of the fire, that he and Hagan had had no disagreements, and that he did not see or hear the fire.

Early the following morning, at approximately 3:00 a.m. on Wednesday, February 11, Horton called 911 and reported that there was a strange white truck in Hagan's driveway. When sheriff's

---

testified that he spoke to the victim on the telephone at around 9:00 that night, that the victim sounded intoxicated, and that he could hear Horton talking in the background.

6

deputies arrived, Horton told them that there was no truck, but he wanted to talk to them about the .22 rifle missing from Hagan's house. Horton explained that he "was laying on the couch that night and it was bothering him and he decided to get up and go find the gun." He led investigators to a bedroom in his mother's home and lifted a mattress to reveal the rifle — which showed no fire or water damage — and a magazine for the rifle, as well as a box of .22-caliber ammunition. He then went with investigators to the sheriff's department and gave a written statement, in which he stated he was going to bed, pulled the mattress off the bed, and found the rifle.

While Horton's mother originally told investigators that she knew nothing about the fire or Hagan's death, on Wednesday, February 11, Horton's sister called the sheriff's office and said that her mother had something to tell them.[3] Two investigators went to Mrs. Horton's home and interviewed her in the presence of her

---

[3] It appeared that Mrs. Horton mistakenly believed that Horton had turned himself in for the murder when he went to the police station with the deputies after showing them the rifle, and she then told her daughter what had happened.

daughter. She informed them that on the night of the fire, she was about to go to bed when she heard a pounding on the back door. It was Horton, "covered from head-to-toe in blood" and "very distraught." He was frantic and saying, "Oh, God, oh, God, he's dead over there, I've killed him, I've killed Jeff." He told her that he must have passed out and when he came to, Jeff and the dog were both dead, and he supposed he must have killed the dog as well. Mrs. Horton told investigators that she used two rags to wipe the blood off his face, and that he cleaned up outside and gave her his clothes, which she laundered twice.[4] She said that he then told her that he was going back to Hagan's home "to finish it" or "to burn the house." Mrs. Horton added that when Horton was drinking liquor, he turned "from Dr. Jekyll to Mr. Hyde." The investigator acknowledged that Mrs. Horton stated she "suffered from some dementia" but that she

---

[4] Mrs. Horton described the clothes as a pair of khaki shorts, black socks, a pair of black or camouflage "Croc-type shoes," and a brown shirt. Investigators located the shorts and socks inside Mrs. Horton's home, cleaned and folded but with reddish-brown stains on them, and two washrags with similar stains were found in the dryer. The shoes were found in Horton's trailer.

seemed to be aware of her circumstances and apologized to investigators for not contacting them earlier.

An investigator testified that Mrs. Horton gave two more statements which provided some additional information but were consistent with her original statement. At the preliminary hearing in this case, Mrs. Horton testified under oath to Horton's exclamation that he had "killed Jeff," his report that he had "passed out or something," and that when he woke up it was "like a bear in the room." She mentioned that she had taken her prescription medication on the night of the fire and that it caused her to hallucinate, and testified that Horton was not covered "from head-to-toe" in blood, but that he had "some blood on him."

When Horton was confronted by investigators with his mother's statement that he had appeared at her door with blood on him and stated that he killed Hagan, he denied that any of that took place and insisted that any blood on him could have been dog's blood from breaking up a dog fight, that it would not be Hagan's blood, and that he would not have killed Hagan. At one point, according to

an investigator, he questioned whether Hagan was even dead. He said that his mother would exaggerate and that he had told her about watching fights on television "where men tear each other apart." When asked why he didn't mention a dog fight on the night of the incident, "[h]e said that, well, I'm not saying it happened or it didn't happen; it's just that's one of the things that happens, that's how I can get blood on me." He continued to deny that he or his mother put Hagan's rifle into her home, and stated that someone else must have put it there.

At trial, Horton's mother was a reluctant witness, stating that she did not want to be there. She asserted that she was suffering from stress and dementia and was abusing her prescription medication on the night of the incident. She claimed that she must have misunderstood what Horton said to her because she "lost four days," but acknowledged that she told GBI agents that Horton said he killed Hagan. She testified that Horton "had something on him," but claimed Horton told her it was barbeque sauce. She admitted that she cleaned Horton's face and washed his clothes, that he was

"really upset" and told her "it was like there was a bear in the house," and that he told her he was going back to Hagan's residence, although she denied that Horton told her he was going to "finish it," claiming that the investigator "added that into it." She recalled that she had seen Horton with Hagan's rifle on the day that Hagan died and that Horton said Hagan was going to loan it to him.

Horton's sister testified and stated that her mother told her that Horton had turned himself in for the murder. After her mother told her what Horton had said, the daughter contacted the GBI and was present at the interview. While she could not recall the entire interview, she confirmed much of what agents testified that Mrs. Horton stated in that interview, including that Horton was hysterical and exclaiming that he "had killed Jeff," that he "cut him up," and that "it was like a bear in the room." She also stated that Mrs. Horton said she had cleaned Horton's face and washed his clothes twice. Finally, the daughter testified that she believed Horton was verbally abusive to their mother and that she thought her mother might change her story "to protect" Horton.

11

(a) Horton contends the evidence was insufficient to support his conviction for concealing a death or, alternatively, that the arson charge should merge into the conviction for concealing a death. These contentions are without merit.

Horton argues that the burning of Hagan's house did not conceal his death because the testimony of the firefighters and the medical examiner showed that authorities knew he was dead before the fire started. In fact, Horton contends, the fire expedited the discovery of the body by calling attention to the burning home. In short, he claims, Hagan's death was never concealed, and any alleged concealment did not hinder the discovery that Hagan was unlawfully killed.

Under OCGA § 16-10-31, "[a] person who, by concealing the death of any other person, hinders a discovery of whether or not such person was unlawfully killed is guilty of a felony. . . ." And,

> [w]hen evaluating a challenge to the sufficiency of the evidence, we review whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. In making that determination, we do not reweigh evidence or resolve conflicts in testimony; instead, we

review the evidence in a light most favorable to the verdict and defer to the jury.

(Citations omitted.) *Williams v. State*, 304 Ga. 658, 660 (1) (821 SE2d 351) (2018). As in *Carter v. State*, 238 Ga. App. 632 (1) (519 SE2d 717) (1999), where the appellant made a similar contention, the jury was authorized to conclude that Horton's statement that he intended to "finish it" was evidence of his intent to conceal the murder. And while sheriff's deputies believed that they were investigating a fire of undetermined origin resulting in a death, the scene was left unsecured for almost four days and witness interviews were delayed, allowing evidence to deteriorate and to be cleaned, destroyed, or moved in the interim. Horton's actions thus hindered the discovery that Hagan was unlawfully killed.

Horton's alternative contention is similarly without merit. To determine whether one offense should be merged into another, this Court has adopted the "required evidence" test outlined in *Drinkard v. Walker*, 281 Ga. 211 (636 SE2d 530) (2006):

> [T]he applicable rule is that where the same act or transaction constitutes a violation of two distinct

statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not.

(Citation and punctuation omitted.) Id. at 215.

Here, the offense of arson in the first degree is committed when a person, by means of fire or explosive, knowingly damages the dwelling of another without his or her consent or "under such circumstances that it is reasonably foreseeable that human life might be endangered." OCGA § 16-7-60 (a) (5). It thus requires proof of facts not required by OCGA § 16-10-31, while the latter Code provision requires proof of facts that OCGA § 16-7-60 does not. "[T]he two offenses have entirely different elements and require proof of totally different facts." *Chapman v. State*, 280 Ga. 560, 561 (4) (629 SE2d 220) (2006). Horton's contention that the offense of arson should merge into the offense of concealing a death is without merit.

(b) Although Horton has not challenged the sufficiency of the evidence to support his remaining convictions, as is this Court's

current practice in murder cases, we have reviewed the record and conclude that the evidence presented at trial and summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Horton was guilty of the other crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).[5]

2. Horton asserts that the trial court erred when it denied his "implied motion" to strike the jury panel, based on an encounter between the jury and Hagan's mother.[6] After voir dire and selection of jurors, but before the jury was sworn, the jurors were excused for lunch. While the jury was returning from lunch, Hagan's mother left the courtroom, crying, entered the door to the jury room, and quickly

---

[5] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020.  See *Davenport v. State*, 309 Ga. ___, ___ (4) (846 SE2d 83) (2020). The Court began assigning cases to the December term on August 3, 2020.

[6] At the hearing on Horton's motion for new trial and in the motion itself, Horton continued to refer to this motion as one for a mistrial. As discussed below, the proper motion would have been a "challenge to the poll" or a motion for a postponement to strike a new jury, but we review the trial court's ruling for abuse of discretion in either case.

left. After the prosecutor brought the incident to the court's attention, Horton moved for a mistrial, acknowledging that the mother's behavior was not intentional, but asserting that it inadvertently tainted the jury. The parties and the court examined the chief deputy, who witnessed the incident. He stated that he and the bailiff were standing by the door when the mother came out of the courtroom "upset" and walked into the entrance to the jury room, where witnesses had been using the attached restroom previously. The deputy and bailiff moved to stop her, but she had already realized that the room was occupied and turned around. The deputy testified that the mother did not say anything and "did not get very far in there," and that he did not know if any juror had seen her. The trial court responded, "I will deny [the motion] at this point."[7]

---

[7] At the second hearing on Horton's motion for new trial, the victim's assistance advocate testified and provided further facts, summarized by the trial court in its order on the motion for new trial: The courthouse, built in 1921, has only one restroom on the second floor, and it is in the jury room. There is no sign identifying the jury room, and the victim's mother had met with the victim's advocate in the jury room the previous day. A small vestibule separates the jury room from the courtroom. When the victim's mother left the courtroom seeking privacy, she entered the vestibule, saw the jurors, and

After the jury was sworn, at the end of the trial court's preliminary instructions to the jury, the following occurred:

> COURT: Now, I do want to mention that it seems that just a little while ago, a relative of the deceased in this case accidentally went into your area headed towards the bathroom not thinking that you were in there. I would caution you not to let that happening in any way influence you. Is there any one of you who might have seen that that would like to speak to me outside the presence of the rest of the jurors to talk to me about that in any regard?
> JUROR: We all seen it.
> COURT: You all saw it? Okay. Did it . . . will it have an impact? Can everybody stay fair and impartial? Anybody want to talk about it? We'll talk to you one at a time if you want to talk about it. All right. I'm satisfied that it happened inadvertently. . . . But sometimes things like that happen and don't let that have any impact upon you whatsoever. You listen to the evidence, you look at the evidence . . . and you base your verdict upon the opinion you entertain of that evidence presented.

Horton did not renew his motion for mistrial after the trial court's curative instruction or object to the instruction as inadequate.[8]

turned around. She never entered the jury room, and the court officers and victim's advocate immediately escorted her out of the vestibule. Horton's counsel did not call the victim's mother to testify at the motion for new trial.

[8] Because we conclude that the trial court did not abuse its discretion in denying Horton's motion, we do not reach the question of whether he failed to preserve the issue. See *Coleman v. State*, 301 Ga. 720, 723 (3) n.4 (804 SE2d 24) (2017).

Horton argues that the trial court did not apply the proper analysis to his motion, asserting for the first time on appeal that it was more correctly a motion to strike the panel. He contends that the trial court erred when it did not consider whether the jury was tainted by the mother's outburst and did not conduct individual voir dire of the jurors, and further erred when it identified the source of the outburst as "a relative of the deceased." We conclude, however, that in reviewing such a motion, regardless of its name, we review the trial court's decision for abuse of discretion, and under that standard, either would fail.

> The time for making a motion for mistrial is not ripe until the case has begun, and the trial does not begin until the jury has been impaneled and sworn. Therefore, the trial court correctly refused to declare a mistrial. [Appellant] did not utilize the proper procedural tool, which was either a "challenge to the poll" or a motion for a postponement to impanel other jurors who had not heard the remark. However, there is authority for disregarding the nomenclature of a defendant's premature motion for mistrial when the clear import of the motion is that the jury panel be excused and another panel be made available.

(Citations and punctuation omitted.) *Sharpe v. State*, 272 Ga. 684,

687 (5) (531 SE2d 84) (2000); see also *Lord v. State*, 304 Ga. 532, 535 (2) (820 SE2d 16) (2018). In reviewing such a motion, regardless of its name, we review the trial court's decision for abuse of discretion. Id. And the appropriate inquiry is whether the conduct in question was "*inherently* prejudicial and deprived [Horton] of [his] right to begin [his] trial with a jury free from even a suspicion of prejudgment or fixed opinion." (Citations and punctuation omitted; emphasis in original.) *Sharpe*, 272 Ga. at 688 (5). "Of course, where the facts establish only gossamer possibilities of prejudice, prejudice is not inherent." (Citations and punctuation omitted.) Id. And "the trial judge . . . was in a better position than this Court to determine the nature of the 'commotion' and its likely effect, if any, upon the jury." *Walton v. State*, 293 Ga. 607, 612 (4) (748 SE2d 866) (2013).

In his brief, Horton cites *Sheppard v. State*, 235 Ga. 89 (218 SE2d 830) (1975), for the proposition that "where such an outburst *could* prevent the defendant from receiving a fair trial, the court must grant a new trial." (Emphasis supplied by Appellant.) Id. at 91 (2). This is not *Sheppard*'s standard for evaluating the prejudicial

19

effect of an outburst in the presence of the jury. In *Sheppard,* after a verbal outburst from a victim's mother, Sheppard moved for a mistrial. The trial court denied the motion and instructed the jury to ignore the outburst, and this Court affirmed, holding:

> Demonstrations and outbursts which occur during the course of a trial are matters within the trial court's discretion unless a new trial is necessary to [e]nsure a fair trial. *Where the trial court fails to act to stop the disturbance, or fails to instruct the jury to disregard it, and the demonstration could prevent the defendant from receiving a fair trial, this court must grant a new trial.* Here the trial judge immediately instructed the jury to disregard the outburst, and it is unlikely that this single outcry from a spectator prejudiced appellant's entire defense.

(Citations omitted; emphasis supplied.) Id. The other cases cited by Horton are inapposite, as the conduct of Hagan's mother here does not reach the level of disruption or intentionality in those decisions. See, e.g., *Glenn v. State,* 205 Ga. 32 (52 SE2d 319) (1949) (judgment reversed when victim's widow, encouraged by prosecutor to "let the jury know she was interested," dressed all in black, sat inside the bar, and wept loudly throughout State's closing argument; she was not removed immediately on defense objection, and trial court gave

20

no curative instruction or admonition to the prosecutor).

Here, in contrast, Horton's trial counsel conceded, and the trial court found, that the mother's conduct was inadvertent. Her exposure to jurors was minimal, as she did not speak, she left the entrance to the jury room as soon as she saw it was occupied, and officers of the court promptly removed her from the area. Finally, the trial court inquired of the jurors whether they could remain impartial, assured them that they could speak with the court individually, and instructed them to disregard the incident and decide the case only on the evidence presented.[9] See *Todd v. State*, 261 Ga. 766, 769 (3) (410 SE2d 725) (1991) (trial court did not abuse discretion in denying motion for mistrial after victim's mother left

---

[9] Horton's contention that "the superior court here never did any type of questioning to determine if the jurors could remain fair and impartial" is incorrect. Horton complains that the trial court did not examine the jurors *before* they were impaneled and sworn, which he contends is the proper procedure for a motion to strike the panel. But Horton moved for a mistrial and argued in his motion for new trial that a mistrial was warranted; he did not correct this error until his brief on appeal, and "he cannot subsequently complain about alleged errors he helped to induce." *Morris v. State*, 301 Ga. 702, 707 (2) (c) (804 SE2d 42) (2017).

courtroom sobbing, and trial court instructed jury to disregard incident).[10] The trial court did not abuse its discretion in taking the steps that it did to counter the potential effects of the mother's conduct, and we cannot say that this single incident deprived Horton of a fair and impartial trial.

3. Although Horton acknowledges that he failed to object at trial, he asserts that the trial court committed plain error in three instructions to the jury.

> Under plain error review, we will reverse the trial court only if the instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings.

(Citations and punctuation omitted.) *Walter v. State*, 304 Ga. 760, 764 (3) (822 SE2d 266) (2018). "Satisfying all four prongs of this standard is difficult, as it should be." (Citations and punctuation

---

[10] The cases cited by Horton indicate that the jury's knowledge that the source of the outburst is a relative of the deceased is not, as Horton contends, dispositive, but a matter to be taken into account by the trial court in the exercise of its discretion.

22

omitted.) *Clarke v. State*, 308 Ga. 630, 637 (5) (842 SE2d 863) (2020).

(a) Horton first complains of the trial court's sua sponte curative instruction regarding Hagan's mother's encounter with jurors. Appellant argues that this charge was plain error because the trial court failed to poll the jury, because it informed the jury that the individual was "a relative of the deceased," and because it expressed an impermissible opinion under OCGA § 17-8-57 (a) (1)[11]

---

[11] OCGA § 17-8-57 (a) provides:

> (a) (1) It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused.
>
> (2) Any party who alleges a violation of paragraph (1) of this subsection shall make a timely objection and inform the court of the specific objection and the grounds for such objection, outside of the jury's hearing and presence. After such objection has been made, and if it is sustained, it shall be the duty of the court to give a curative instruction to the jury or declare a mistrial, if appropriate.
>
> (b) Except as provided in subsection (c) of this Code section, failure to make a timely objection to an alleged violation of paragraph (1) of subsection (a) of this Code section shall preclude appellate review, unless such violation constitutes plain error which affects substantive rights of the parties. Plain error may be considered on appeal even when a timely objection informing the court of the specific objection was not made, so long as such error affects substantive rights of the parties.
>
> (c) Should any judge express an opinion as to the guilt of the accused, the Supreme Court or Court of Appeals or the trial court in a motion for a new trial shall grant a new trial.

23

that the individual's stumbling into the jury room while crying was "inadvertent." But, as we have observed in Division 2, above, the measures undertaken by the trial court, including questioning the jury and giving a curative instruction, were within the trial court's discretion in attempting to remedy any potential effects of the incident witnessed by the jurors. "It is presumed that the jury, which was under oath, followed the trial court's instructions unless there is clear evidence to the contrary." *Menefee v. State*, 301 Ga. 505, 516 (4) (b) (801 SE2d 782) (2017). And, as we noted above, the jury's knowledge that a relative of the deceased is involved is not dispositive. Finally, with respect to Horton's contention that the trial court violated OCGA § 17-8-57, "[w]e have previously explained that the remarks of a judge explaining a reason for his ruling are neither an expression of opinion nor a comment on the evidence." (Citations and punctuation omitted.) *Sessions v. State*, 304 Ga. 343, 348 (3) (818 SE2d 615) (2018). The trial court did not comment on either the veracity of any testimony or Horton's guilt in explaining the reasons for its denial of Horton's motion for mistrial or to strike

24

the jury panel. Moreover, Horton's counsel conceded that the mother's conduct was not intentional. Horton therefore has failed to demonstrate that any alleged error on the part of the trial court was obvious beyond reasonable dispute.

(b) Horton contends the trial court committed plain error in instructing the jury that a single witness is sufficient to prove a fact, without instructing the jury that Horton's confession must be corroborated under OCGA § 24-8-823.[12] Again, we disagree.

Both the Attorney General and the District Attorney contend that Horton's statement to his mother was not a "confession," but merely an "admission," because it lacked the element of intent. We need not consider that question, however, because Horton has failed to satisfy the third prong of the plain error test: that any error affected the outcome of the court proceedings.

---

[12] OCGA § 24-8-823 provides: "All admissions shall be scanned with care, and confessions of guilt shall be received with great caution. A confession alone, uncorroborated by any other evidence, shall not justify a conviction." This provision was carried forward unchanged from Georgia's former Evidence Code.

In *English v. State*, 300 Ga. 471, 474 (2) (796 SE2d 258) (2017), as here, we considered whether failing to give an unrequested charge on corroboration of a confession amounted to plain error. English was charged with malice murder and first degree arson; he admitted to police that he fought with the victim and hit him multiple times over the head with an object, but did not admit to killing him or to setting his house on fire, only that he left to clean up after the fight and later returned to check on the victim. Id. at 473 (1). We found that English's statement was an admission rather than a confession, and that he therefore was not entitled to a corroboration charge. Id. at 474 (2).

But we went on to conclude that English had failed to demonstrate the third prong of the plain error test, because he could not show that error, if any, affected the outcome of the court proceedings, given the extensive corroborating evidence, including English's statements to others, presence at the crime scene, and forensic evidence. See id. Similarly, in *Clarke*, 308 Ga. at 637 (5), the appellant contended that the failure to give a confession-

corroboration instruction was plain error. We concluded that, even assuming that appellant's out-of-court statements, individually or collectively, amounted to a confession, he could not demonstrate that the error affected the outcome of the trial court proceedings "because there was ample corroborating evidence at trial." Id.

Horton asserts that the quantum of corroborating evidence in his case is less than that in *English* or *Clarke*, contending that there were no eyewitnesses, forensic evidence, incriminating statements to police, or evidence of animosity between Horton and Hagan. This statement is not accurate; although there were no eyewitnesses to the murder, two witnesses placed Horton in Hagan's home on the evening of the murder, and Horton acknowledged to police that he was there as late as 9:00 p.m., while his mother told police that her conversation with Horton took place as she was going to bed, around 11:00 p.m. or midnight. The forensic evidence, though much potential material was destroyed in the fire, included red or brown stains on wash rags and on clothing that multiple witnesses testified (but Horton denied) that he was wearing on the evening of the fire

and that his mother acknowledged washing twice and putting away. Horton's statements to police included inconsistencies such as his statement that he was wearing a black sweat suit on the night of the fire despite multiple witnesses' consistent accounts of Horton's clothing throughout the evening, his statements regarding the possible sources of any blood that he "might" have had on him, his volunteering to investigators that he owned a .22 rifle although that was not the firearm owned by Horton, and, finally, his summoning deputies on a pretext and then leading them to Hagan's missing rifle, magazine, and ammunition concealed in his mother's home. Because of this extensive corroboration, pretermitting whether his statement was a confession rather than an admission the trial court proceedings were not likely affected by the trial court's failure sua sponte to instruct the jury on corroboration of a defendant's confession. See *Clarke*, 308 Ga. at 637 (5).

(c) Horton next contends that the trial court committed plain error in failing to instruct the jury that the testimony of an accomplice must be corroborated after giving the single-witness

28

instruction, contending that his mother was an accomplice. See

OCGA § 24-14-8.[13] Again, Horton has failed to demonstrate plain

error.

"In considering whether a witness is an accomplice, we look to

the definition of party to a crime found in OCGA § 16-2-20."[14] *Walter*,

304 Ga. at 766 (3) (b). Under that definition, "[t]here must be some

evidence showing that the defendant shared a common criminal

---

[13] That Code section provides:

> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including prosecutions for treason, prosecutions for perjury, and felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason.

[14] That Code section provides:

> (a) Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime.
>
> (b) A person is concerned in the commission of a crime only if he:
>
> > (1) Directly commits the crime;
> >
> > (2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity;
> >
> > (3) Intentionally aids or abets in the commission of the crime; or
> >
> > (4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

29

intent to commit the crimes in question with the actual perpetrators." (Citation omitted.) *Higuera-Guiterrez v. State*, 298 Ga. 41, 43 (2) (779 SE2d 288) (2015). Moreover, evidence of an individual's actions and knowledge *after* the commission of the crimes

> is insufficient to satisfy the standard of OCGA § 16-2-20. At best, it would show that [the individual] was an accessory after the fact, not a party to the crimes. At common law and under modern practice, an accessory after the fact is not considered an accomplice to the underlying crime itself, but is guilty of a separate, substantive offense in the nature of obstruction of justice.

(Citation, punctuation and footnote omitted.) Id. at 44 (2).

Here, the cases relied on by Horton to claim that his mother was his accomplice include substantial evidence that the alleged accomplice actively participated in some way in the crimes taking place. In *Doyle v. State*, 307 Ga. 609 (837 SE2d 833) (2020), we held that the trial court committed plain error in failing to instruct the jury on accomplice corroboration. See id. at 612-613 (2). It is true that the witness in *Doyle* did not report the shooting and initially told a detective that he knew nothing about the crime. But he also

30

drove Doyle and another man to a business after hearing them discuss "hurting somebody or jumping on somebody" and "getting payback," saw Doyle holding a gun and the other man "rack" a gun, and then drove them from the scene after hearing gunshots and stopping to let Doyle back in the car. Id. In *State v. Johnson*, 305 Ga. 237 (824 SE2d 317) (2019), this Court affirmed the trial court's grant of a new trial on the basis of failure to give the accomplice-corroboration charge. The witness was indicted jointly with Johnson for the victim's murder, was riding in the car when the victim was shot, told his girlfriend "that he and Johnson had killed [the victim]," and helped dispose of the victim's body. Id. at 238. In *Stanbury v. State*, 299 Ga. 125 (786 SE2d 672) (2016), the witness was also indicted jointly, actively participated in the armed robbery and shooting, and was the only witness who affirmatively identified Stanbury. See id. at 129-130 (2). Finally, in *Hamm v. State*, 294 Ga. 791 (756 SE2d 507) (2014), the witness "set up a lick," decoyed the victim to the scene of the shooting, fled the scene immediately afterwards, left town, and failed to report the crime until she and

31

Hamm were found by investigators. See id. at 794 (2). We noted that "such evidence is clearly the type of evidence our courts view as supporting the finding that one is an accomplice" and held that "it was error for the trial court to refuse to give the requested instruction." Id.

Here, in contrast, the evidence does not show that Horton's mother aided or abetted the commission of the crimes or advised Horton to do so, that she was ever at the crime scene, or that she witnessed, participated in, or was even aware of the incident until Horton appeared at her door covered in blood and announced that he had killed Hagan. Horton's mother then helped Horton clean up and washed his clothes.[15] While she did not immediately call police then or when Horton said he was going back to the house, and initially denied to investigators that she knew anything, she shortly afterwards volunteered her story to deputies, albeit at the urging of her daughter. These actions are more typical of an accessory after

---

[15] The indictment specifically charged Horton with concealing Hagan's death "by arson."

the fact than an accomplice. Horton has pointed to no law clearly demonstrating that his mother can be considered an accomplice, nor to any argument by his trial counsel or the State suggesting that she was an accomplice. Horton therefore cannot meet the second prong of the plain error test by showing that any error was obvious beyond reasonable dispute.

> [Horton] cites no precedent requiring an accomplice-corroboration instruction under circumstances similar to those presented here. An error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point. On this record, we cannot conclude that the trial court committed obvious error in failing to instruct the jury on corroboration of accomplice testimony.

(Citations and punctuation omitted.) *Walter*, 304 Ga. at 767 (3) (b). Under these circumstances and in the absence of controlling authority on point, Horton has failed to show plain error.

4. Pointing to testimony at the preliminary hearing by a GBI agent that hairs were found in Hagan's hand and sent to the lab for testing, as well as a laboratory report showing the testing of hairs found on Hagan's clothing, Horton argues that the State violated his

33

due process right to a fair trial under *Napue v. Illinois*, 360 U. S. 264, 269 (79 SCt 1173, 3 LE2d 1217) (1959), by allowing the medical examiner to testify falsely that there was no biological evidence found on Hagan's burned body and then relying on that false testimony in its closing argument to contend that no such evidence was found. But the medical examiner's testimony was not false.

On cross-examination, the medical examiner was asked, "Did you take any blood samples or any other type of biological samples from the decedent?" and he responded, "Yes, ma'am." He then testified about the reasons for the blood samples taken and the significance of Hagan's very high blood alcohol content. Horton's counsel asked several follow-up questions, including whether the blood alcohol content might have been affected by the fire, but never returned to the witness' initial affirmative response to inquire about other biological samples or tests. On re-direct, the State inquired about other toxicology tests, which were negative, but on re-cross Horton's counsel only asked several questions about Hagan's

34

wounds.[16]

Horton relies upon a lengthy quote from the medical examiner's testimony to assert that the witness testified falsely. However, this response is part of a series of specific questions posed by Horton's counsel on cross-examination regarding knives found in Hagan's home after the fire, some of which could have inflicted the wounds observed on Hagan, and whether any DNA evidence was recovered *from those knives*. It is clear from the witness' response that he was answering that specific question.[17] It is true that the witness did not mention the hair samples recovered from Hagan or his clothing, but he was not asked about them; his testimony therefore was not false, but only arguably incomplete as he was not asked about hair samples and did not volunteer any nonresponsive

---

[16] As discussed below, hairs were recovered from the victim's clothing and tested. The medical examiner's presentation also noted "focal fibers" on the victim's left hand which apparently were preserved, but the record contains no further evidence regarding testing of those fibers.

[17] Horton's appellate counsel misleadingly removed from the quotation in his brief, with an ellipsis, the medical examiner's specific reference to the knives in his answer.

information.

Moreover, to whatever extent the prosecutor allowed the medical examiner to testify in a misleading manner, Horton's claim was not preserved because it was not raised at trial. "Because Appellant did not raise this claim of prosecutorial misconduct at trial, it was not preserved for appeal." *Brooks v. State*, 305 Ga. 600, 606 (3) (826 SE2d 45) (2019); see also *Mohamed v. State*, 307 Ga. 89, 96 (3) (f) n.7  (834 SE2d 762) (2019) (claim that "'the prosecution presented its case to the jury in a manner inconsistent with the findings in the GBI reports'" not preserved for appeal). The same is true of Horton's complaint regarding the State's closing argument. See *Gates v. State*, 298 Ga. 324, 328-329 (4) (781 SE2d 772) (2016) (where appellant did not object at trial, alleged improper remarks during closing argument not subject to review on appeal for plain error).

And "[i]n any event, when a defendant alleges a factually specific claim of prosecutorial misconduct, the defendant must show actual misconduct and demonstrable prejudice to his right to a fair

trial in order to reverse his conviction." (Citation and punctuation omitted.) *Cushenberry v. State*, 300 Ga. 190, 195 (2) (b) (794 SE2d 165) (2016). For the reasons discussed in connection with Horton's allegations of ineffective assistance of counsel in Division 5 (a), Horton has not shown that a jury would have considered that unknown and inconclusive hair samples found on Hagan's clothing created a reasonable doubt in the face of all the evidence presented. "Pretermitting whether the prosecutor acted altogether properly, Appellant has not demonstrated prejudice." *Brooks*, 305 Ga. at 606 (3).

5. Finally, Horton alleges that his trial counsel provided constitutionally ineffective assistance in two respects. To prevail on his claim of ineffective assistance, Horton must prove both that the performance of his lawyer was professionally deficient and that he was prejudiced by this deficient performance. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Horton must show that his attorney "performed at trial in an objectively unreasonable way

considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). This requires a defendant to "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." (Citation and punctuation omitted.) *Marshall v. State*, 297 Ga. 445, 448 (2) (774 SE2d 675) (2015). And to prove prejudice, Horton "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). And "[i]f there is no showing of deficient performance, we need not address the prejudice issue." *Romer*, 293 Ga. at 344 (3).

(a) Horton complains that trial counsel failed to introduce evidence supporting Horton's theory of defense and rebutting the State's theory of the case: a GBI laboratory report regarding the testing of hairs from Hagan's clothing, showing that two of the hairs

38

were inconsistent with the hairs of either Horton or Hagan. This, Horton contends, suggests that an unknown third person killed Hagan. The slide presentation prepared by the medical examiner and shown to the jury notes that "focal fibers" were found on Hagan's left hand, but nothing in the record reveals what those fibers were, what became of them, or the test results, if any.[18]

This evidence was briefly discussed at the first hearing on Horton's motion for new trial, but trial counsel had no recollection

---

[18] Horton attached to his motion for new trial a copy of a report from the GBI crime lab dated April 29, 2016, showing that the laboratory compared hair samples from the victim's pants and socks with known hair samples from the victim and Horton. The results showed that two hairs from the socks were inconsistent with either the victim's hair or Horton's hair, while the results of microscopic examination of a third hair, from the pants, were inconclusive. Horton contends that this evidence suggests that a stranger was present in the house at the time of the victim's death and could have been the actual killer.

Horton also refers to the June 2016 preliminary hearing testimony of a GBI agent that "there was hair found in the victim's hand during the autopsy." According to the agent, a later review of the case uncovered this fact, and the hair was sent to the crime lab to be processed. The medical examiner's slide presentation to the jury contains a notation that "focal fibers are on the left hand" and that "additional procedures" included "fibers from left hand." But there is no further mention in the record of any fibers found on the victim's left hand. The record therefore does not reveal what became of those fibers, what tests may have been performed, or the results of any tests. Horton called a hair microanalyst from the GBI crime lab at the second hearing on his motion for new trial, but that witness did not testify about anything other than the April 2016 laboratory report.

of her reasons for not raising the issue of the laboratory report:

> I don't really remember the circumstances surrounding this and it was not admitted. The State didn't call anyone and obviously the Defense didn't either in regards to this. And I've looked back through the file; I can't find any notes or anything that would explain what was going on, you know, with this.

Even when trial counsel does not recall the reasons for a particular decision at trial, there remains

> a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect. . . . [A] tactical decision will not form the basis for an ineffective assistance of counsel claim unless it was so patently unreasonable that no competent attorney would have chosen it.

(Citations and punctuation omitted.) *Brown v. State*, 288 Ga. 902, 909 (5) (708 SE2d 294) (2011). And "decisions as to what witnesses and other evidence to present are matters of trial strategy and are ineffective only if unreasonable ones that no competent attorney would make." (Citation omitted.) *Walker v. State*, 301 Ga. 482, 491 (4) (c) (801 SE2d 804) (2017).

Here, by the time Hagan's body was presented to the medical examiner, it was not only badly burned but had been handled by

numerous persons and exposed to a substantial amount of foreign material. Firefighters stumbled over Hagan's body in the midst of the still-burning fire, covered with insulation and other debris that had fallen during the partial collapse of the home. They hastily dragged him by his feet out of the home, sprayed him with water to remove some of the debris, and then covered him with a tarp after emergency medical personnel examined him and declared him dead. The fire investigator removed more debris from Hagan's body in order to take photographs. Thus, it is possible that an undetermined number of individuals not only disturbed any existing evidence, but also deposited biological material on the body. In addition, no testimony was presented concerning how long Hagan had worn the clothing in which he was found at the time of his death, or the number of persons he might have come in contact with while wearing it. A competent attorney could reasonably have concluded that, given the number of people on the scene and the manner in which Hagan's body was handled, all that the hair analysis could show was that an unidentified third person was in contact with

Hagan at some point, possibly after his death. See *Green v. State*, 291 Ga. 287, 297 (10) (c) (728 SE2d 668) (2012) (counsel reasonably concluded that DNA testing of material on victim's body "would not be helpful or exculpatory" when victim was raped and murdered in "filthy" shed used as a toilet and presumably containing DNA from many individuals).

In addition, the laboratory report shows that the third hair that revealed "both similarities and dissimilarities" with Horton's hair was referred for additional nuclear and mitochondrial DNA testing, but the results of that testing do not appear in the record. Competent counsel could reasonably have concluded that further testing might have revealed that the hair indeed was Horton's, and that evidence would have been damaging to Horton's defense. Similarly, if the fibers from Hagan's hand had in fact been tested and proved to be Horton's hair, testimony to that effect also would have been harmful to the defense. See *Boykins-White v. State*, 305 Ga. App. 827, 830 (2) (a) (701 SE2d 221) (2010) (trial court authorized to find failure to request further DNA tests reasonable

trial tactic; initial tests "were favorable to [appellant]" and additional testing might have implicated appellant).

Finally, Horton has failed to show prejudice. "[T]his Court has equated the prejudice step of the plain error standard with the prejudice prong for an ineffective assistance of counsel claim." *Hampton v. State*, 302 Ga. 166, 168-169 (2) (805 SE2d 902) (2017). Therefore, even if we were to conclude that trial counsel performed deficiently in failing to introduce the hair analysis report, we have already determined that Horton has failed to show prejudice in connection with his claim of plain error, "so we also conclude, for the reasons discussed [above], that he has failed to show the requisite prejudice under *Strickland*." *Stepp-McCommons v. State*, 309 Ga. __, __ (4) (a) (845 SE2d 643) (2020).

(b) Horton also asserts that trial counsel was constitutionally deficient in failing to investigate the mental health of Horton's mother. Trial counsel testified with respect to this claim at the hearing on Horton's motion for new trial, stating that she did not believe it necessary to retain an expert witness because she "felt that

it would be obvious from Mrs. Horton's demeanor in court, from demeanor she had previously exhibited in court, and to what I knew her testimony was going to be, as well as testimony of another family member that there were competency issues with Mrs. Horton." On cross-examination of Mrs. Horton and her daughter, trial counsel brought out that Mrs. Horton had had mental health issues for most of her life and was institutionalized during her daughter's childhood. She also elicited testimony that on the night of Hagan's death, Mrs. Horton was abusing her medication, which caused her to be disoriented and hallucinate; that she was under great stress due to the death of one of her daughters only a few days before as well as the earlier death of her husband; and that she had been diagnosed with dementia for ten to fifteen years. Counsel believed that those issues were adequately covered and that "the jury would be able to tell from watching her in court and her ability to testify that there were issues with Mrs. Horton." Unlike trial counsel, the trial court, and the jury itself, this Court did not observe the witness' demeanor while she was giving her testimony.

Moreover, the psychologist who testified at the hearing on the motion for new trial did not examine Horton's mother until November 2018, three years and nine months after she gave her first statement to investigators, and his testimony was somewhat inconclusive. He acknowledged that he "could not say definitively" that Horton's mother was impaired at the time she gave her statement almost four years earlier, although he thought that "the likelihood is that she was impaired." Nor could he say that the medications she was reportedly taking would have interfered with her cognitive abilities, only that they "had the potential" to do so. Horton has not demonstrated this somewhat equivocal testimony would have been better than the mother's and daughter's own detailed testimony about the mother's mental health issues.

> [T]he decision whether to present an expert witness, like other decisions about which defense witnesses to call, is a matter of trial strategy that, if reasonable, will not sustain a claim of ineffective assistance. [And] for a defendant to establish that a strategic decision constitutes deficient performance, a defendant must show that no competent attorney, under similar circumstances, would have made it.

45

(Citations and punctuation omitted.) *Sullivan v. State,* 308 Ga. 508, 512 (2) (b) (842 SE2d 5) (2020). Horton has failed to demonstrate that counsel's decision not to retain an expert was constitutionally deficient.

(c) Finally, Horton contends that the cumulative effect of trial counsel's two errors prejudiced him under the rule announced in *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007). However, we have determined that trial counsel's conduct was not constitutionally deficient with respect to either error alleged, even though in one instance we determined that Horton also had failed to demonstrate prejudice. This enumeration of error is therefore without merit.

*Judgment affirmed. All the Justices concur, except Warren, J., not participating.*

Decided October 5, 2020 —Reconsideration denied November 2, 2020.

Murder. Candler Superior Court. Before Judge Palmer.

*Jackie L. Tyo, Brandon A. Bullard*, for appellant.

*S. Hayward Altman, District Attorney, Jessica B. Wilson, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.